**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


**STEVEN DADING**                                    **CIVIL ACTION**

**versus**                                           **NO. 05-0100**

**GOODYEAR TIRE & RUBBER**                           **SECTION "C"**
**COMPANY and RIVER OAKS HOSPITAL**

<u>**ORDER AND REASONS**</u>[1]

     Before the Court is Defendant River Oaks Hospital's ("River Oaks") Motion to Dismiss

for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil

Procedure 12(b)(6).  River Oaks seeks to have all claims filed by the Plaintiff Steven Dading

(Mr. Dading) dismissed for failing to allege a valid cause of action or for being prematurely

brought before this Court without having first been considered by a medical review panel

pursuant to the Louisiana Medical Malpractice Act ("LMMA").  La. R.S. 40:1299.47.  Because

the Court believes that Mr. Dading's claims sound in medical malpractice and, therefore, fall

under the Louisiana Medical Malpractice Act, the Court GRANTS the motion.


**I.**       **FACTUAL & PROCEDURAL BACKGROUND**

---

[1]  Mary A. Barket, a second year law student at Tulane Law School, assisted with the research
and preparation of this decision.

1

Mr. Dading admitted himself into a drug rehabilitation program at River Oaks, which was apparently paid for in whole or in part by Mr. Dading's employer Goodyear Tire & Rubber Company ("Goodyear").  During the course of Mr. Dading's treatment, a person contacted River Oaks alleging that Mr. Dading had relapsed on alcohol.  River Oaks then recommended that he readmit himself to in-patient care for three days, which Mr. Dading did.  Shortly thereafter, Mr. Dading received notice that Goodyear was terminating his employment.

Mr. Dading subsequently filed this suit against alleging discrimination in violation of the Americans with Disabilities Act of 1990 and La. R.S. 23:323, et seq., and 51:2231, et seq., against Goodyear, and making supplementary claims under Louisiana Civil Code articles 2315, 2316, 2317, and 2320 against River Oaks under 28 U.S.C § 1367.  In particular, Mr. Dading's claims against River Oaks stated that River Oaks had recommended that Mr. Dading readmit himself to in-patient care based on an unsubstantiated call.  Mr. Dading further contends that because he followed this erroneous advice, Goodyear received the "impression" that he had relapsed and fired him.

River Oaks then filed a motion to dismiss for failure to state a claim upon which relief can be granted based in part on application of the LMMA.  Mr. Dading's response to the motion to dismiss argued that the LMMA was not applicable because he was alleging intentional torts not covered by the LMMA.  He also asserted specific claims for defamation and false light invasion of privacy against River Oaks, claiming (1) that the communication to Mr. Dading to readmit himself resulted in others receiving a false impression of Mr. Dading's condition and/or

(2) that River Oaks sent Goodyear a communication either stating that Mr. Dading had relapsed or giving the impression that he had relapsed.[2]

The motion to dismiss did not specifically address defamation and false light invasion of privacy. River Oaks, therefore, filed a response brief reasserting its previous arguments regarding the LMMA's applicability and specifically addressing defamation and false light claims. Along with its brief, River Oaks submitted additional evidence for the Court's consideration and asked that its 12(b)(6) motion be treated as a motion for summary judgment. Because this request was raised only days before the hearing and this Court considers conversion unnecessary for the reasons stated below, this Court will not treat the motion to dismiss as a motion for summary judgment.

## II. STANDARD OF REVIEW

Motions to dismiss are a disfavored means of disposing of a case and should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Southern Christian Leadership Conference v. Supreme Court of the State of Louisiana*, 252 F.3d 781, 786 (5th Cir. 2001) (*citing Conley v. Gibson*, 355 U.S. 41 (1957)). When considering a 12(b)(6) motion to dismiss, this Court must liberally construe the plaintiff's complaint and accept all factual allegations in the complaint as true. *Shipp v. McMahon,* 199 F.2d 1045, 1050 (5th Cir. 2000). Nevertheless, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Southern Christian Leadership Conference*, 252 F.3d at 786 (*quoting Fernandez-Montes v. Allied Pilots Ass'n.*, 987 F.2d 278, 184 (5th Cir. 1993).

---

[2] This was the first time Mr. Dading specifically alleged defamation and false light invasion of privacy and was the first time Mr. Dading mentioned any communication between River Oaks and Goodyear. He did not specify as to its form or precisely what was stated.

### III.    ANALYSIS

As the applicability of the LMMA directly determines whether this Court must consider Mr. Dading's claims at this time, any analysis of his claims begins at whether the LMMA applies. La. R.S. 40:1299.47(B)(1)(a)(i); *Todd v. Angelloz*, 844 So.2d 316, 318-20 (La. App. 1 Cir. 3/28/03) (holding that a court must sustain an exception of prematurity and dismiss the claim if a malpractice claim against a health care provider covered by the LMMA has been filed in district court without having first been presented to a medical review panel); *Williamson v. Hosp. Service District No. 1 of Jefferson*, 888 So.2d 782, 785 (La. 2004).

Louisiana's Medical Malpractice Act applies to all claims "arising from medical malpractice" and states that "[n]o action against a health care provider covered by this Part, or his insurer, may be commenced in any court before the claimant's proposed complaint has been presented to a medical review panel established pursuant to this Section."  La. R.S. 40:1299.47(B)(1)(a)(I).  All other tort liability on the part of a qualified health care provider falls under general tort law. *Coleman v. Deno*, 813 So.2d 303, 315 (La. 2002); *Spradlin v. Acadia-St. Landry Medical Foundation*, 758 So. 2d 116 (La. 2000).

When construing the LMMA, Louisiana courts have consistently held that because the LMMA's limitations on liability are special legislation in derogation of the rights of tort victims, "the coverage of the Act should be strictly construed" with "any ambiguities in the MMA construed against coverage." *Williamson*, 888 So.2d at 786-88; *see also Muse v. Lane Memorial Hospital Foundation*, 2005 La. App. LEXIS 1301, *13 (La. App. 1 Cir. 05/13/05).  Once it is determined that a claim falls within the purview of the LMMA, however, it is subject to the provisions of the LMMA *even though alternative theories of liability are possible.  Rogers v.*

*Synthes, Ltd.*, 626 So.2d 775, 777 (La. App. 2d Cir. 1993) (emphasis added); *see also Todd*, 844 So.2d at 318-20.

Mr. Dading has maintained that the LMMA does not apply because the Act does not extend to claims against hospitals and because Mr. Dading's claims are intentional torts that do not constitute "medical malpractice" under the LMMA. An examination of the Act and cases applying the LMMA demonstrates that Mr. Dading's assertion that the LMMA "contemplates claims against doctors, not hospitals" is without merit. (Plaintiff's Opposition p.6).

As previously mentioned, the act states that it extends to all medical malpractice claims "against a *health care provider* covered by this Part." (emphasis added). The LMMA defines "health care provider" as:

> [A] person, partnership, limited liability partnership, limited liability company, corporation, facility, or institution licensed or certified by this state to provide health care or professional services as a physician, hospital … psychologist, social worker, licensed professional counselor … or an officer, employee, partner, member, shareholder, or agent thereof acting in the course and scope of his employment.

La. R.S. 40:1299.41(A)(1).

On its face, the statute appears to apply to claims against hospitals.

Beyond looking at the applicable statutory language, a review of previous cases indicates that the LMMA has previously applied to claims against hospitals. In *Richardson v. Advanced Cardiovascular Systems, Inc.*, for instance, the court first noted a number of state court cases applying the LMMA to claims against a variety of defendants, including hospitals, before finding that the LMMA covered claims against a hospital alleging negligence in the handling of a medical implant. 865 F.Supp. 1210, 1216-18 (E.D. La. 1994). The applicability of the LMMA to claims against hospitals is especially apparent in *Rogers*, where a Louisiana court stated that "[a]ny conduct by a hospital complained of by a patient is properly within the scope of the

Louisiana Medical Malpractice Act if it can be reasonably said that it comes within the definitions of the act." 626 So.2d at 777.

Facially and as applied, the LMMA clearly covers claims against hospitals as long as they are "certified by the state" and provide some of the enumerated services. It is undisputed that River Oaks is a state-certified institution, and it is undisputed that River Oaks offers "professional services as a … psychologist or professional counselor." River Oaks, therefore, falls squarely under the definition of "health care provider" provided for in the Act.

As the LMMA covers claims against "health care providers" and River Oaks falls within this definition, the relevant inquiry is whether Mr. Dading's claims arise from "medical malpractice." "Malpractice" is defined in the LMMA as:

> [A]ny unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely.

La. R.S. 40:1299.41(A)(8).

The possibility of alternative theories and the fact that plaintiffs sometimes allege intentional torts in order to avoid falling under the LMMA indicate that further investigation into whether a claim sufficiently sounds in "medical malpractice" is necessary. *See Muse*, 2005 La. App. LEXIS 1301 at *18 (finding it necessary to determine "whether, as a factual matter, the breach of contract claim alleged [was] really for a breach of contract or simply a restatement of a negligence claim in contract terms"); *see also Richardson v. Advanced Cardiovascular Systems, Inc.*, 865 F.Supp. at 1218-19; *Keating v. Shell Chemical Co.*, 610 F.2d 328, 332 (5th Cir. 1980). In order to determine whether an alleged action is "medical malpractice" and subject to the provisions of the LMMA, the Louisiana Supreme Court has set out a list of factors for courts to consider, including:

(1) whether the particular wrong is 'treatment related' or caused by a dereliction of professional skill,

(2) whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached,

(3) whether the act or omission involved assessment of the patient's condition,

(4) whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform,

(5) whether the injury would have occurred if the patient had not sought treatment; and

(6) whether the tort alleged was intentional.

*Coleman v. Deno*. 813 So.2d 303, 315-16 (La. 2002).

An evaluation of the alleged misconduct in terms of the *Coleman* factors and the interpretation of these factors by Louisiana courts indicates that Mr. Dading's defamation and false light invasion of privacy claims arise from an alleged instance of medical malpractice on the part of River Oaks.

### 1.      Whether the Particular Wrong is 'Treatment Related' or Caused by a Dereliction of Professional Skill.

Mr. Dading argues that the hospital's recommendation that he readmit himself to in-patient care was not treatment related because it was based on a mechanical bureaucratic procedure and not on an individualized assessment by a doctor.  Assuming the recommendation was based solely on the hospital's policy, it would, nevertheless, have a direct bearing on the level of treatment received.

As cases involving similar "policy" arguments demonstrate, when a "policy" decision directly impacts the treatment received, it is sufficiently treatment related to be subject to the statute.  In *Fuentes v. Doctors Hospital of Jefferson*, for instance, the Louisiana Fourth Circuit Court of Appeal found that a hospital's policy of not requiring another person to be present during an examination was treatment related and covered by the LMMA because it had direct effects on how a patient was treated. 802 So.2d 865, 868-69 (La. App. 4 Cir. 11/21/01). Similarly, in *Muse*, the court refused to consider a hospital's "denial of [a] bone scan" purely

administrative even though it occurred because of pre-payment difficulties.  2005 La. App.

LEXIS at *16.  Even *Coleman*, the case cited by Mr. Dading in support of his argument that this

was not treatment related, indicates that a hospital or individual's alleged "policy" regarding

admission decisions may be treatment related.  Specifically, the *Coleman* court found that an

emergency room doctor's decision to send a patient to another hospital, which was allegedly

made based on monetary considerations and his personal policy towards whether the patient was

able to pay, was treatment related.  813 So.2d at 316; *see also Bolden v. Dunaway*, 727 So.2d

597 (La. App. 1 Cir. 12/28/98), *writ denied*, 739 So.2d 801 (La. 1999) (finding a doctor's

decision not to operate on a patient because he had not been paid was treatment related and not

solely monetary).

 Beyond directly relating to a treatment recommendation, the alleged harm in this case

clearly arises from a dereliction of professional skill.  Mr. Dading's complaint basically argues

that River Oaks had a duty to assess whether the patient actually relapsed before recommending

a particular course of treatment, that River Oaks breached this duty, and that the erroneous

recommendation and conclusions River Oaks made regarding his condition because of his

improper evaluation resulted in harm to his reputation.

 **2. Whether the Wrong Requires Expert Medical Evidence to Determine if the Appropriate Standard of Care was Breached.**

 When determining whether expert medical evidence is needed to establish a breach in the

appropriate standard of care, courts frequently consider whether the alleged behavior is

obviously negligent and whether the wrongful conduct can be evaluated based on common

knowledge.  *See Pfiffner v. Correa*, 643 So.2d 1228 (La. 1994) (discussing examples of cases

involving "obvious negligence," such as the failure of an on-call physician to respond to an

emergency when he knows he should be present).  Mr. Dading asserts that medical evidence

would not be needed to determine whether the appropriate standard of care was breached because no assessment was made and it is common knowledge that some assessment was necessary.[3]

On its face, however, it is difficult to say whether patients in Mr. Dading's situation frequently lie and how much assessment of a patient is normally required or undertaken before altering treatment from an intense out-patient stay to an in-patient stay.  In *Rogers*, for instance, a case involving allegations of misconduct by a psychologist, the court found that the plaintiff "would be required to present expert testimony to establish what is the standard of care for a psychologist in performing a psychological evaluation as well as the role of a psychologist in a custody determination." 844 So.2d at 319.

Additionally, because Mr. Dading asserts that the drug test proves that he did not relapse, expert testimony could be required to determine the reliability of the drug test taken by Mr. Dading and whether hospitals are reasonable in acting without first receiving test results. Accordingly, it appears that expert testimony would be required to establish whether the appropriate standard of care was breached.

**3.    Whether the Act or Omission Involved Assessment of the Patient's Condition.**

Mr. Dading denies that any assessment took place and suggests that it was solely a policy decision.  Once again assuming it was merely a policy decision, the recommendation involved an assessment of the patient's condition insofar as it involved the level of scrutiny River Oaks used when assessing Mr. Dading (no appraisal versus a blood-test and a brief conversation versus a full psychological evaluation, etc.).  The discussion of *Coleman* and similar cases mentioned in the evaluation of the first factor also has bearing on this factor and demonstrates

---

[3] In the hearing on the Motion to Dismiss and in an affidavit attached to Plaintiff's Surreply, however, Mr. Dading's attorney indicated that additional time was needed in order for her to consult with medical experts.

that even decisions apparently based on policy may be construed as involving an assessment of the patient if they directly affect whether the patient receives an assessment.

### 4.   Whether the Act or Omission Occurred in the Context of a Doctor-Patient Relationship or the Scope of Activities the Hospital is Licensed to Perform.

In regards to whether the act occurred in the context of a doctor-patient relationship, Mr. Dading alleges that the recommendation for his readmission did not occur in such a relationship because it was done without consulting any of the doctors who had been treating him.  The essence of Mr. Dading's claim, however, is that a doctor failed to inquire into whether he actually had relapsed when the doctor had a duty to do so.  Thus, he is essentially alleging that the claim arises from an omission occurring in the context of a doctor-patient relationship.

The question of whether the act or omission was within the scope of activities the hospital is licensed to perform may also be affirmatively answered despite Mr. Dading's assertion that he is only alleging that the *recommendation* was tortious and not that the *treatment* itself was tortious.  Mr. Dading does not contest that the hospital is licensed to make decisions regarding the treatment of its patients, but is apparently attempting to divorce an admittance decision from a treatment decision.  In *Coleman*, the plaintiffs forwarded a similar argument, which the court refused to uphold.  Instead the court found that because the decision to admit or send the patient to another hospital directly impacted the patient's treatment, it was not possible to entirely separate the decisions. 813 So.2d at 318.  In light of such precedence and the fact that the hospital's recommendation in this case clearly affected Mr. Dading's treatment, the recommendation in question falls squarely within the scope of an activity the hospital is licensed to perform.

**5.   Whether the Injury Would Have Occurred had the Patient not Sought Treatment**.

Mr. Dading maintains that he did not "seek" readmittance and, therefore, was not injured by him seeking treatment.  As River Oaks points out, however, the recommendation for in-patient care was made in the context of a comprehensive treatment program in which Mr. Dading had voluntarily enrolled.[4]  Thus, had Mr. Dading not initially sought treatment at River Oaks and/or sought treatment elsewhere, it is possible that the alleged injury to his reputation and the subsequent firing would not have occurred.  This is assuming, of course, that River Oaks recommendation was unreasonably made and that another hospital would have adequately investigated the allegations against Mr. Dading before making a recommendation.

**6.   Whether the Tort Alleged was Intentional.**

According to Louisiana law, a plaintiff alleging an intentional tort must show that the defendant desired the result or realized to a virtual certainty that the result would occur.  *Smith v. Mahfouz,* 489 So.2d 409, 413 (La. App. 3d Cir.), writ denied, 494 So.2d 1181 (La. 1986).  Mr. Dading claims that he is alleging intentional torts such that he is not subject to the LMMA.  Merely using the word "intent" is not, however, "a talisman that can change the allegations into colorable claims of true intentional torts." *Keating v. Shell Chemical Co*., 610 F.2d 328, 332 (5th Cir. 1980).

Looking at Mr. Dading's allegations and assertions, he does not appear to allege anything beyond negligence against River Oaks.  He does not allege that River Oaks wanted Goodyear to fire him, but instead asserts that River Oaks "should have known the risk of dismissal" (p.5), that it was "reasonably foreseeable" (p. 5) that Goodyear would believe Mr. Dading had relapsed,

---

[4] In his initial complaint, Mr. Dading also seems to agree that he had enrolled himself in a comprehensive treatment program.  At one point, he collectively refers to his initial five day in-patient stay and the six week out-patient stay as a "program." (05-CV-0100, Rec. Doc. 1 at 3).  He further states that the harm alleged occurred "[t]owards the very end of this program" and that he readmitted himself in order to "follow the program."  Id.

and that River Oaks was "well aware that … most employers will not retain an employee who suffers a relapse" (p. 8). Assuming that they are true, such allegations do not rise to the level of virtual certainty required to support an intentional tort.

The difference between negligence and intent is certainly one of degree, but there is, nevertheless, a line between the two. As this Court has previously acknowledged, "the defendant who acts in the belief or consciousness that he is causing an appreciable risk of harm to another may be negligent, and if the risk is great his conduct may be characterized as reckless or wanton, but it not classed as an intentional wrong." *Keating*, 610 F.2d at 332 (quoting Prosser, Law of Torts, 4th Ed. 1971, at 32).

When distinguishing between the two, courts will frequently look for "obvious negligence" (*Coleman*, 813 So.2d at 318) or "outrageous conduct" (*Richardson*, 865 F.Supp. at 1218). While treatment may carry a certain stigma, it is not immediately "obvious" that a recommendation for in-patient care will result in a person being fired. It is even less obvious when the employer is already aware that the patient is in the process of undergoing treatment and has indicated its support of that process by paying for it. Under these circumstances, it is not clear that River Oaks was acting outrageously or was obviously negligent in merely suggesting that Mr. Dading readmit himself to in-patient care. At most, River Oaks may have been guilty of gross negligence in failing to investigate whether Mr. Dading had actually relapsed.[5]

Finally, Mr. Dading urges the opportunity to amend the Complaint to more specifically allege defamation. The Court has assumed for purpose of this motion that the elements of

---

[5] Louisiana law does recognize negligent defamation such that Mr. Dading may state a claim against River Oaks, but it would have to be reviewed by a medical review panel first. *Williamson v. Historic Hurstville Assoc.*, 556 So.2d 103, 107-08 (La. App. 4th Cir. 1990).

defamation were alleged.  The factual recitation already in the Complaint is complete and thorough and does not allege an intentional tort.

### IV.     CONCLUSION

Having analyzed Mr. Dading's allegations against River Oaks in terms of the factors set out in Coleman, this Court finds that his claims fall under the Louisiana Medical Malpractice Act.  Accordingly, dismissal of his claims at this time is appropriate.

IT IS ORDERED that the claims against River Oaks in the above-captioned matter be DISMISSED AS PREMATURE.

New Orleans, Louisiana, this 25th day of July, 2005.

Helen G. Berrigan
United States District Judge